UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PAUL MAZANT, ET AL.                     CIVIL ACTION

VERSUS                                  NO. 04-0057

VISIONEERING, INC., ET AL.              SECTION B(1)

ORDER AND REASONS

For the reasons stated below,

**IT IS ORDERED** that Visioneering's and Burnham's Motion for Summary Judgment as to the government contractor defense are **DENIED**.

**IT IS FURTHER ORDERED** that Burnham's Motion for Summary Judgment with respect to its duties as component-part manufacturer is **GRANTED**.

**IT IS FURTHER ORDERED** that Visioneering's Motion to Strike Plaintiff's Supplemental Memorandum is **DENIED.**

DISCUSSION

Visioneering and Burnham[1] move for summary judgment based on the government contractor defense, an affirmative defense.  *See*

---

[1]Burnham refers to Defendants Burnham Composites, Inc.; Burnham Products, Inc.; and Senior Operations, Inc.
Burnham also moves for Summary Judgment based on its argument that Plaintiffs are unable to prove any set of facts that would allow recovery against Burnham.

1

*Mitchell v. Lone Star Ammunition, Inc.*, 913 F.3d 242, 248 n.12 (5th Cir. 1990).  A party asserting an affirmative defense bears the burden of proving that defense.  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991).  When the moving party would bear "the burden of proof at trial, it must come forward with evidence [on summary judgment] which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Id.* at 1264-65 (internal quotation and citation omitted).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts.  *Matushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party must come forward with specific facts showing there is a genuine issue for trial.  *Id.* at 587.  The mere existence of a scintilla of evidence on the nonmoving party's position is insufficient to defeat a properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The nonmoving party must present evidence upon which a reasonable jury could reasonably find for the nonmovant.  *Id.*

*Government Contractor Defense*

Visioneering and Burnham assert that, as government subcontractors, they are shielded from liability by the

government contractor defense.  The government contractor defense
is an affirmative defense that must be established by the party
claiming it.  *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d
744, 746 (9th Cir. 1997) (citing *McKay v. Rockwell Int'l Corp*,
704 F.2d 444 (9th Cir. 1983)); *Mitchell*, 913 F.3d at 248 n.12.
The defense applies to both negligence and strict liability
actions, as well as other state law tort claims.  *Smith v. Xerox
Corp.*, 866 F.2d 135, 137 (5th Cir. 1989).  The defense acts to
preempt state tort law in areas of unique federal interest.
*Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).
Preemption of this kind is warranted only when the imposition of
liability under state law would create a significant conflict
with federal policy in an area of uniquely federal interest.  *Id.*
 In determining whether the defense applies, courts consider (1)
whether the United States approved reasonably precise
specifications, (2) whether the equipment produced conformed to
those specifications, and (3) whether the supplier warned the
United States about any dangers in the use of the equipment that
were known to the supplier but not the government.  *Id.* at 512;
*Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir.
2000).

     Visioneering and Burnham argue that the government
contractor defense applies to subcontractors.  This Court is
persuaded that under some circumstances a subcontractor *may*

3

qualify for the defense.  The Fifth Circuit has acknowledged the possibility of a government subcontractor defense.  *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000) (finding the government contractor defense applicable to a supplier of a component to a military aircraft); *Garner v. Santoro*, 865 F.2d 629, 637 n.13 (5th Cir. 1989) (noting and rejecting plaintiff's argument for a per se rule that a party is precluded from arguing the government contractor defense solely because the party does not have a direct contact with a governmental entity).  Other circuits have clearly adopted the government contractor defense to subcontractors and suppliers.  *See Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990);  *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989).

In recognizing the government contractor defense, the *Boyle* Court relied in part on the discretionary functions exception to the Federal Tort Claims Act (FTCA).  *Boyle*, 487 U.S. at 511.  The *Boyle* Court concluded that the selection of the appropriate design pursuant to a contract to design and manufacture military equipment fell within the type of discretionary function protected by the FTCA.  *Id.*  The court noted its concern that exposing government contractors to liability would result in the cost being passed along to the government, and that "[i]t makes little sense to insulate the Government against financial

liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 511-12.

The first *Boyle* element, that the United States approve reasonably precise specifications for the product, is to assure that the government, and not the contractor, is exercising discretion in selection the design. *Boyle*, 487 U.S. at 512; *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 334 (5th Cir. 1991). In considering the first *Boyle* factor, the Fifth Circuit noted that approval "requires more than a rubber stamp." *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989). "The government exercises discretion when it actually chooses a design feature." *Id.*

In each case cited by Defendants Visioneering and Burnham in support of their argument for a government subcontractor defense, a unit or division of government was intimately involved in the design development process. In *Maguire*, Air Force officials[2] worked closely with a government contractor on the development of a gas turbine helicopter engine. 912 F.2d at 71. An Air Force senior project engineer reviewed and approved every element of the proposed design and changes thereto. After design was

---

[2]Although the helicopter at issue was designed for Army use, the Army transferred a large part of the responsibility and testing of the engine to the Air Force. 912 F.2d at 71.

complete, the military tested the engine.  After testing, the Air Force senior project engineer gave a detained presentation on the design to the Air Force Engine Review Board, which approved the original design.  Subsequently, pursuant to a Component Improvement Program, a new engine ball bearing was incorporated into the engine.  The change was documented in an Engineering Change Proposal.  Prior to the change being incorporated, the contractor submitted an Advanced Engineering Memorandum, which included precise details regarding the proposed change.  The Army Aviation Systems Command's Configuration Control Board received the proposal and distributed it for consideration among its departments.  The departments reported back on impacts of the proposed change, and a meeting was held to consider competing interests of departments.  After this internal evaluation, the Army approved the proposed bearing changed and amended the contractor's contract to reflect the specifications and drawing incorporating the new bearing into the design.  The *Maguire* court found this review process demonstrated the government approved reasonably precise specifications, and rejected plaintiff's argument that government's approval of the subcontractor's ball bearing amounted to no more than a "rubber stamp."  *Id.* Similarly extensive discussions of government entity involvement in the design process were engaged in in *Tate* and *Ramey*.  *Tate*, 140 F.3d at 658-59 (discussing the "intensive and numerous

6

reviews conduced by Army officials"); *Ramey*, 874 F.2d 948, 951 (discussing Navy's involvement in providing the design used by the subcontractor and Navy's subsequent inspections and testing of seat components, as well as Navy's examination of a mock-up of the seat).

In the instant case, the only government "approval" was indicated by the signatures of Jocelyn Connelly, the onsite government administrative contracting officer, and Harold Bencaz, a senior project engineer at NASA, on the Advance Authority to Proceed Against Lockheed Martin Space Systems Company Purchase Agreement No. R440496.  Although extensive, detailed documentation led to the issuance of the Advance Authority, no indication is given of the level of review Connelly or Bencaz engaged in before signing the document.  Visioneering and Burnham focus their analysis on the extensive review of the Visioneering's efforts done by Lockheed, including ongoing discussions of the design process and design reviews at the 30, 60, and 90 percent stages.  Visioneering and Burnham also emphasize that, under the terms of Visioneering's contract with Lockheed, Visioneering was also subject to elective reviews by the government itself, however gives no indication that any such review was done.  The Court has found no support in Visioneering's or Burnham's cited case law, or any other case law, that supports a position that would allow the government to

designate a prime contractor to substitute its judgment and discretion for that of the government.  While Defendants have shown the government's contractor, Lockheed, engaged in extensive review of Visioneering's design, Defendants have failed to prove that the *government* review and approval in this case was any more than a "rubber stamp."  *See Trevino*, 865 F.2d at 1480.

The first *Boyle* element addresses the discretionary functions exception to government liability.  It requires that the government approve reasonably precise specifications in order for a government contractor or subcontractor to assert the government contractor defense.  Defendants' evidence indicates only that government representatives "rubber stamped" the paperwork submitted by government contractor Lockheed.  This is insufficient to sustain the first element of the government contractor defense, and thus insufficient to assert the defense.[3]

*Component-Part Manufacturer Liability*

Burnham argues as an alternative to the government contractor defense that as a component-part manufacturer, it is not liable to Plaintiffs.  Burnham contends no facts in the case implicate Burnham as the cause of Plaintiff's accident.  Burnham argues that Plaintiff's injuries were caused by an unsupported

---

[3]Having concluded Defendants are unable to carry their burden as to the first *Boyle* element, the Court declines to address the other two elements, which Plaintiffs fail to address in their Opposition.

foot extension, which resulted from Visioneering's design, which Burnham had no involvement in or knowledge of.

All parties have submitted expert reports in this case. Burnham contends the experts are in agreement that the primary cause of the accident was the presence of an unsupported foot extension (tab), and no expert has rendered any opinion finding the honeycomb panel itself defective. Plaintiffs' expert indicates that the floor panel was defective as fabricated due to the manner in which the bulk material was sectioned, and that the edge of the tab was overcut during the fabrication process. It is uncontested that Burnham delivered its standard size panels to Visioneering, and that any subsequent cuts to the bulk material that resulted in tabs were performed by Visioneering pursuant to its design. Plaintiffs fail to allege or prove any fact suggesting that Burnham manufactured a defective product or was otherwise negligent.

A component-part manufacturer, whose product was merely incorporated into a product created by another manufacturer, does not have a duty to warn a plaintiff regarding the use of its product. *Longo v. I.E. Dupont de Nemours & Co.*, 93-CA-0756 (La. App. 4th Cir. 02-18-94); 632 So.2d 1193, 1197.[4]  Even if the

---

[4] The Court notes the that this conclusion in *Longo* was reached after the *Longo* court concluded the product was not unreasonably dangerous. Plaintiffs' Petition alleged Burnham's product was unreasonably dangerous as manufactured. The record is devoid of any evidence Burnham's product was unreasonably

supplier has some knowledge concerning how its product will be incorporated into an end product, the supplier is not liable when it had "no control over the design, composition, testing, or manufacture" of the end product. *Id.* (granting summary judgment to a component-part manufacturer whose product had been incorporated into another manufacturer's defective product).

Plaintiffs contend Burnham participated in the design of the platform by responding to Visioneering's request that some of the decking include an additional layer of fiberglass. The Court is not persuaded. It is uncontested that Burnham provided its standard product with a modification requested by Visioneering. No evidence suggests Burnham was ever consulted as to platform design in any respect. Plaintiffs attempt to create an issue of fact where none exists.

The manufacturer of an end product has the "ultimate

---

dangerous. Plaintiffs' Opposition to Burnham's Motion for Summary Judgment focuses on Burnham's alleged role in design of the platform and Burnham's failure to warn. Finding no issue of material fact, the Court concludes Burnham's product was not unreasonably dangerous as designed.

Plaintiffs argue that the decking component manufactured by Burnham was unreasonably dangerous due to Burnham's failure to warn, citing *Moore v. Safeway, Inc.*, to support their propostion. *See* 95-1552 (La. App. 1st Cir. 11-22-96); 700 So. 2d 831, 850. The Court notes that three experts' testimony indicated the scaffolding at issue in that case was unreasonably dangerous *at the time the scaffolding left Safeway's control*. No expert report presented in this case, or any other evidence to the effect, supports a finding that the decking supplied by Burnham was unreasonably dangerous at the time it left Burnham's control.

responsibility for determining whether the end-product or its components will be safe and suitable for the purpose for which it is finally sold." *Champion v. Panel Era Mfg. Co.*, 410 So. 2d 1230, 1241 (La. App. 3d Cir. 1982).  In *Champion*, the manufacturer of defective insulation material brought a third-party action against the manufacturers of component parts of the insulation.  *Id.*  The court upheld the jury's determination that the third-party component-part manufacturer owed no contribution or indemnity to the principle defendants.  *Id.* at 1242.  The court held that a manufacturer of the end product had a duty to select its components properly and that it needed to apply technical knowledge to determine whether the components were safe for their intended use.  *Id.*

     The supplier of a component part of an end product is not liable without a showing that plaintiff's injury "was caused by a defect contained in the component part, rather than a defect contained in the finished product." *Reeves v. Great Atl. & Pac. Tea Co.*, 370 So. 2d 202, 209 (La. App. 3d Cir. 1979) (holding the Coca-Cola Company, as the supplier of nondefective syrup to a bottling company, not liable for plaintiff's injuries resulting from a defective drink).  When a component supplier provides the product that the end product manufacturer requested, but the end product manufacturer misuses the product, the component supplier is not liable. *Guidry v. Dwight Manuel, inc.*, 03-1236 (La. App.

3d Cir. 07-07-04); 887 So. 2d 346, 348-50 (upholding the jury's conclusion that a concrete supplier was not liable because it provided a concrete mix of the requested strength that contractor failed to mix the concrete properly).  The record is devoid of any evidence that Burnham produced a defective product.  Burnham provided the products as Visioneering requested.  Burnham had no further duty to make sure the component part was properly incorporated into the final product.

*Visioneering's Motion to Strike*

This matter was set for hearing on August 3, 2005.  Prior to that date, Visioneering sought and received leave to respond to Plaintiff's Opposition to Visioneering's Motion for Summary Judgment.  On August 19, 2005, Plaintiffs sought and received leave to file a further supplemental memorandum.  Visioneering contends this Court should strike the supplemental memorandum because it was improvidently and untimely filed.

Under Federal Rule of Civil Procedure 15(a), a court shall freely give leave to file an amendment when justice so requires.  Plaintiffs here were accused of misrepresentations in their initial opposition.  Plaintiffs requested leave to file a reply to correct any misperceptions/perceived misrepresentations.  The Court had not yet ruled on Visioneering's Motion for Summary Judgment.  This Court finds that allowing the supplemental memorandum, which aimed at amending/correcting the alleged

12

misrepresentations, prior to any ruling being made, was in the interests of justice and, thus, properly granted.

New Orleans, Louisiana, this 14th day of March, 2006.

UNITED STATES DISTRICT JUDGE